## UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

PETER ATAKPU,
Plaintiff

vs

CINDY LAWSON,
Defendant

Case No. 1:05-cv-524
Spiegel, J.
Hogan, M.J.

**REPORT AND
RECOMMENDATION**

Plaintiff, an inmate at the Lebanon Correctional Institution (LeCI), brings this prisoner

civil rights action under 42 U.S.C. § 1983. Defendant Cindy Lawson is the former LeCI Health

Care Administrator. Plaintiff alleges that defendant Lawson was deliberately indifferent to his

serious medical needs in violation of his Eighth Amendment rights. This matter is before the

Court on defendant's motion for summary judgment and motion to renew and supplement her

motion for summary judgment (Docs. 24, 39), plaintiff's memorandum in opposition (Doc. 45),

and defendant's reply memorandum. (Doc. 49). This matter is also before the Court on

plaintiff's motion to amend the complaint (Doc. 44), defendant's memorandum in opposition

(Doc. 46), and plaintiff's reply memorandum. (Doc. 50).

### I. Facts

In the summer of 2002, plaintiff injured his shoulder on pull up bars while working out.

He did not seek medical attention until about five months later. On December 11, 2002, he came

to nurse's sick call complaining about pain in his left shoulder. He stated that he was unable to

lift his arm up but he could put his arm behind his back. (Doc. 24, Exh. A-2). Plaintiff was seen

by the prison doctor on December 13, 2002. The doctor noted some crepitation in the joint, no

focal tenderness over the biceps tendon, and reduced range of motion. (Doc. 24, Exh. A-3). The doctor diagnosed chronic tendonitis, ordered x-rays for the affected shoulder, and prescribed Naprosyn. (Doc. 24, Exh. A-3). The doctor also noted that they might try to inject the area if there is no improvement. *Id.*

On December 16, 2002, plaintiff received x-rays of two views of the left shoulder. Although the x-ray report indicates that the examination was limited due to under penetration, it did note that no obvious fracture or dislocation was identified. (Doc. 24, Exh. B).

Three months later, on March 16, 2003, plaintiff returned to the infirmary and complained about left shoulder pain. (Doc. 24, Exh. A-3). He stated that the Motrin was effective but he was still having some pain. He was told he would be referred to the doctor for further evaluation. *Id.* Plaintiff was examined by the doctor two days later. *Id.* The doctor noted full range of motion in all planes and no focal tenderness. *Id.* Plaintiff was seen in the infirmary in April and July 2003. An MRI of his shoulder was ordered in July 2003. (Doc. 24, Exh. D). Progress notes of August 13, 2003, indicate an order was written on July 20, 2003 for a referral to the Corrections Medical Center (CMC) in Columbus, Ohio. (Doc. 24, Exh. A-4).

On September 10, 2003, plaintiff was sent to the orthopedic clinic at the Corrections Medical Center. (Doc. 24, Exh. A-4). He was diagnosed with a rotator cuff tear and scheduled for surgical repair. On October 27, 2003, plaintiff was admitted to the Corrections Medical Center for surgery to repair his left rotator cuff. (Doc. 24, Exh. C).

On November 7, 2003, plaintiff returned to LeCI. The progress notes show he was in a shoulder immobilizer with steri-strips intact to the left shoulder with active drainage. He was given Motrin 200 mg as needed for pain. (Doc. 24, Exh. A-4). Plaintiff was seen by the prison

2

doctor on November 14, 2003. The doctor noted that plaintiff was ambulatory and seemed to be in no distress. (Doc. 24, Exh. A-5). Plaintiff was wearing a shoulder immobilizer which he stated he removed several times a day to move his shoulder. *Id.* Plaintiff complained of some pain and the doctor prescribed Ultram for one month. *Id.* Ultram, while not a narcotic, is considered "a drug of choice in the institution" and one that is often abused by inmates. (Doc. 24, Exh. G, Weiss Aff. ¶24). As a result, it is counted and monitored closely to ensure its proper use by inmates. (Doc. 24, Exh. G, Weiss Aff. ¶24).

Four days later, plaintiff was seen again by the doctor for a wound check. The doctor noted that he was to be seen for a follow up appointment at the Ohio State Medical Center in a week or two. He was still wearing the shoulder immobilizer and appeared to "be doing reasonably well." (Doc. 24, Exh. A-5). The doctor noted that the suture line looked fine and that the sutures "do not need to be removed today." *Id.*

On December 9, 2003, plaintiff asked to have his Ultram renewed. (Doc. 24, Exh. A-6). The doctor agreed to renew it for two more weeks, noting "Hopefully, at that point we can stop it." *Id.* The following day plaintiff returned to the Corrections Medical Center for a follow up visit. *Id.* When he returned, he received a Theraband to use for exercise. *Id.* The Theraband is a rubberized stretching device used to exercise the shoulder. (Doc. 24, Exh. G, Weiss Aff. ¶14). Because of the security level of LeCI, a Theraband can only be used in the infirmary as it could be a potential weapon or noose. (Doc. 24, Exh. G, Weiss Aff. ¶ 15). Medical records indicate that on December 24, 2003, plaintiff received physical therapy at the CMC clinic. (Doc. 24, Exh. A-6). He was also placed on "red band" medical idle status due to his injury. *Id.* The red band

provides the inmate with an excuse not to work. (Doc. 24, Exh. G, Weiss Aff. ¶18). An inmate on a red band restriction is also not permitted to go to recreation. *Id.*

On January 11, 2004, plaintiff requested to have the red band removed, indicating that he wanted to go back to work and did not want to continue being idle. *Id.* The doctor advised him to wait until he was re-evaluated by the surgeons at CMC. *Id.*

In February 2004, plaintiff again asked for his red band to be removed. (Doc. 24, Exh. A-7). Plaintiff stated he was doing well and that seemed to be consistent with the physical therapist who had seen him a few days previously. The doctor reported, "He is still using his Thera-Band and says that if we remove his rec restriction, he will not abuse his shoulder; I believe him." Therefore, the red band was removed. *Id.*

Corrections Medical Center appointment records indicate that plaintiff went back and forth to CMC on a number of occasions for physical therapy. (Doc. 24, Exh. D). The record shows he was seen at CMC a total of 27 times including 2 surgeries with follow ups and an evaluation. (Id.; Doc. 24, Exh. G, ¶12).

After a few months, plaintiff began complaining again about shoulder pain. Notes from June 2004 indicate recurrent shoulder pain, for which he was prescribed Ultram. (Doc. 24, Exh. A-8). Plaintiff was again referred to the orthopedic clinic at the Corrections Medical Center. *Id.* A note on July 9, 2004, indicates that plaintiff's shoulder continued to hurt and that he requested his Ultram be renewed. (Doc. 24, Exh. A-8). The doctor noted that plaintiff "moves arms easily, uses them equally getting up off table." He also noted that an MRI was pending. *Id.*

On August 4, 2004, plaintiff was referred to Ohio State Medical Center for an MRI of his left shoulder. *Id.* Later that month, he was seen by the doctor for complaints of foot pain and was referred to the foot doctor. *Id.*

In October 2004, plaintiff was seen at the orthopedic clinic at CMC. He was recommended for arthroscopic surgery. (Doc. 24, Exh. A-9). On November 24, 2004, he underwent a second surgery on his left shoulder. (Doc. 24, Exh. E). In December 2004, he returned to the orthopedic clinic at CMC for follow-up visits.

In March 2005, plaintiff complained of shoulder pain and asked for his Ultram to be renewed. (Doc. 24, Exh. A-10). In April 2005, the progress notes indicate plaintiff was having problems with both shoulders, with the left greater than the right. *Id.* His prescription for Ultram was increased and renewed. *Id.* A note dated April 14, 2005 states that plaintiff was "caught cheeking his noon dose of Ultram." (Doc. 24, Exh. A-10). "Cheeking" a medication means that an inmate is not taking the medication as prescribed, but either hoarding it or even possibly selling it. (Doc. 24, Exh. G, Weiss Aff. ¶26). Plaintiff's chart was sent to the doctor for review. (Doc. 24, Exh. A-10). A progress note dated April 26, 2005 states that plaintiff "want[s] shoulder fixed" and "wants Ultram back." *Id.* The note states plaintiff "gets off the table by raising himself from the sitting position using both arms." *Id.* The prescription for Ultram was not renewed. *Id.* Two days later, he was seen at the orthopedic clinic at CMC.

In May 2005, he was again examined at the orthopedic clinic at CMC by Dr. Roberts, his surgeon, who recommended another MRI. (Doc. 24, Exh. A-11). A progress note dated May 27, 2005 states that plaintiff continued to complain of should pain and that Motrin was causing him

stomach upset. *Id.* It was recommended that plaintiff switch to Naprosyn and that "Ultram was stopped secondary to cheeking." *Id.*

On June 3, 2005, he requested an appointment to see the doctor. On June 9, he was a "no show" for doctor's sick call. *Id.* On June 16, 2005, he again requested a doctor's appointment for his back and shoulder.

In July 2005, plaintiff had an MRI exam of his shoulder. (Doc. 24, Exh. A-12). A progress note dated July 14, 2005 states he hurt his shoulder working out originally. *Id.* He was assessed with a rotator cuff tear of the left shoulder and low back strain. *Id.* He was prescribed rest and Naprosyn, and referred to the orthopedic clinic. *Id.*

In August 2005, plaintiff's prescription for Ultram was renewed, albeit in a "crushed" form. (Doc. 24, Exh. L; Doc. 45, Exhs. B-3).

On August 4, 2005 and September 1, 2005, plaintiff was seen by the orthopedic clinic at CMC. (Doc. 24, Exh. A-12, A-13). In September 2005, plaintiff again requested Ultram for left should pain. *Id.* A note dated September 21, 2005 indicates the institution was awaiting approval for further arthroscopic surgery. *Id.*

In November 2005, plaintiff was admitted to CMC for a left shoulder arthroscopy. (Doc. 45, Exh. D-1, D-15). Following surgery, he was prescribed Ultram for pain. *Id.* On November 16, 2005, he was prescribed Tylenol #3 for pain. He was to remain in a sling at all times and be on medical idle for three weeks. (Doc. 45, Exh. D-1, D-14). He returned to LeCI on November 18, 2005. (Doc. 24, Exh. A-13).

6

Plaintiff complained of shoulder and chest pain on January 3, 2006. His EKG showed normal sinus rhythms. He was diagnosed with atypical chest pain of unknown etiology and "possible musculo/skeletal secondary to excessive physical exercise." (Doc. 24, Exh. A-14). On January 18, 2006, he was again sent to CMC for another evaluation of his shoulder. The treating orthopedic surgeon wrote, "There is nothing we can do further for this man from an orthopedic standpoint." (Doc. 24, Exh. F).

## II. Defendant's motion for summary judgment should be granted.

A motion for summary judgment should be granted if the evidence submitted to the court demonstrates that there is no genuine issue as to any material fact and that the movant is entitled to summary judgment as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party must demonstrate the absence of genuine disputes over facts which, under the substantive law governing the issue, could affect the outcome of the action. *Celotex Corp.*, 477 U.S. at 323.

In response to a properly supported summary judgment motion, the non-moving party "is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial." *Sixty Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987); *Harris v. Adams*, 873 F.2d 929, 931 (6th Cir. 1989). "[A]fter a motion for summary judgment has been filed, thereby testing the resisting party's evidence, a factual issue may not be created by filing an affidavit contradicting [one's own] earlier deposition testimony." *Davidson & Jones Dev. Co. v. Elmore Dev. Co.*, 921 F.2d 1343, 1352 (6th Cir. 1991).

7

The trial judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine factual issue for trial. *Anderson*, 477 U.S. at 249-50. The trial court need not search the entire record for material issues of fact, *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989), but must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

If, after an appropriate time for discovery, the opposing party is unable to demonstrate a prima facie case, summary judgment is warranted. *Street*, 886 F.2d at 1478 (citing *Celotex* and *Anderson*). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

After incarceration, only the "unnecessary and wanton" infliction of pain constitutes cruel and unusual punishment proscribed by the Eighth Amendment. *Wilson v. Seizer*, 501 U.S. 294, 298 (1991), quoting *Whitley v. Albert*, 475 U.S. 312, 319 (1986). Unnecessary and wanton infliction of pain includes those conditions that are "totally without penological justification." *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981), quoting *Gregg v. Georgia*, 428 U.S. 153, 183 (1976).

In order to establish a claim for relief under 42 U.S.C. § 1983 for a denial of medical care, a plaintiff must present evidence showing "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). A prisoner who is allowed to suffer needlessly through a denial of medical care when relief is available has a cause of action under the Eighth Amendment against an individual whose

8

deliberate indifference caused the suffering. *Id*; *Byrd v. Wilson*, 701 F.2d 592, 594 (6th Cir. 1983); *Westlake v. Lucas*, 537 F.2d 857, 860 (6th Cir. 1976). Such a claim has both an objective and subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Wilson*, 501 U.S. at 297-300.

The objective component requires that the deprivation alleged be "sufficiently serious." *Farmer v. Brennan*, 511 U.S. at 834, quoting *Wilson*, 501 U.S. at 298. "[O]nly those deprivations denying 'the minimal civilized measure of life's necessities' are sufficiently grave to form the basis of an Eighth Amendment violation." *Wilson v. Seizer*, 501 U.S. 294, 298 (1991), citing *Rhodes*, 452 U.S. at 347. *See also Thompson v. County of Medina, Ohio*, 29 F.3d 238, 242 (6th Cir. 1994).

Under the subjective component, plaintiff must establish that defendants acted with deliberate indifference to his serious medical needs, *Estelle*, 429 U.S. at 106; *see also Farmer*, 511 U.S. at 834; *Wilson*, 501 U.S. at 302-303, which requires evidence that defendants ignored a known risk of harm. *Farmer*, 511 U.S. at 837, 842. A prison official may be held liable for denying an inmate humane conditions of confinement only if he knows that an inmate faces "a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847. Prison officials must exhibit more than lack of due care for a prisoner's health or safety before an Eighth Amendment violation will be found. *Id.* at 835. *See also Whitley*, 475 U.S. at 319. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. It is not enough that the official "should" have perceived a significant risk, but did not. *Id.* Moreover, liability will not be found where a prison official

9

actually knew of a substantial risk of harm to an inmate if he responded reasonably to the risk, even if the harm ultimately was not averted. *Farmer*, 511 U.S. at 844. Applying these standards to the instant case, the Court concludes that plaintiff fails to establish his Eighth Amendment claim.

Plaintiff claims defendant Lawson was deliberately indifferent to his medical needs in four ways. First, he alleges there was a delay in over ten months, from December 11, 2002 until September 10, 2003 before he was finally sent to the CMC orthopedic clinic for an evaluation of his shoulder condition. (Doc. 45 at 3-4). Second, plaintiff alleges there was a four month delay in removal of the sutures from his first surgery which caused tissue damage and permanent scarring. (Doc. 45 at 2). Third, plaintiff claims defendant interfered with plaintiff's prescribed medications based on false accusations of misuse. (Doc. 45 at 5). Fourth, plaintiff argues that he was not provided the physical therapy prescribed by his orthopedic surgeon. (Doc. 45 at 7). The Court shall address each of these arguments in turn.

First, plaintiff claims that the delay of ten months from his first complaint of shoulder pain to his initial surgery constitutes deliberate indifference to his serious medical needs. He also claims that the delay in ordering an MRI to evaluate his shoulder condition also amounts to deliberate indifference. He contends that the eventual diagnosis and treatment were "only provided after numerous complaints specifically directed to Defendant Lawson, as evidenced by the attachments to the initial complaint in this case." (Doc. 45 at 3).

The Court has examined the attachments to the complaint and none of them concern any alleged delay in medical treatment prior to plaintiff's first surgery in November 2003. Plaintiff has presented no evidence that defendant Lawson was aware of his alleged complaints

concerning a delay in treatment prior to his first surgery in November 2003. In the absence of any such evidence, there is no disputed fact as to whether defendant Lawson was deliberately indifferent to plaintiff's medical needs prior to his first surgery.

Nor has plaintiff shown that any other prison official was deliberately indifferent to his shoulder condition once he brought it to the attention of medical personnel. Plaintiff was promptly referred to the prison doctor once he complained about shoulder pain. The doctor diagnosed chronic tendonitis, ordered x-rays, and prescribed pain medication for plaintiff's shoulder. Plaintiff returned to the infirmary in March 2003 and stated that the Motrin was effective but he was still having some pain. When he was examined by the doctor two days later, he had full range of motion in all planes and no focal tenderness. He was again seen in the infirmary in April and July 2003, and referred to the Corrections Medical Center for an orthopedic evaluation in September 2003. The following month, plaintiff had surgery to repair his left rotator cuff.

That plaintiff was treated conservatively following his initial complaints of shoulder pain does not establish deliberate indifference to his medical needs. Rather, it appears to be a reasoned medical judgment given the objective and clinical findings initially presented. When plaintiff's shoulder condition did not improve, the decision was made for an orthopedic referral. Plaintiff's disagreement with the doctor's medical judgment concerning the proper course of treatment to initially follow simply does not amount to deliberate indifference. *Estelle v. Gamble*, 429 U.S. 97, 107 (1976). The decision to follow one course of treatment over another does not constitute deliberate indifference and the Court may not second guess the medical judgments of the prison doctor. *See Westlake*, 537 F.2d at 860 n.5. Even assuming, *arguendo*, that the doctor

11

initially misdiagnosed plaintiff's condition, a claim "that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." *Estelle,* 429 U.S. at 106.

In any event, plaintiff has not presented any evidence showing that the alleged delay caused a sufficiently serious medical injury. Where a prisoner alleges that a delay in medical treatment amounts to a constitutional violation, the inmate "must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment to succeed." *Napier v. Madison County,* 238 F.3d 739, 742 (6th Cir. 2001) (citing *Hill v. Dekalb Reg'l Youth Det. Ctr.,* 40 F.3d 1176, 1188 (11th Cir. 1994)). As clarified by the Sixth Circuit in *Blackmore v. Kalamazoo County,* 390 F.3d 890, 898 (6th Cir. 2004), the *Napier* decision controls in cases where the injury is not apparent or appears to be relatively minor:

> In sum, the "verifying medical evidence" requirement is relevant to those claims involving minor maladies or non-obvious complaints of a serious need for medical care. . . . In a word, *Napier* does not apply to medical care claims where facts show an obvious need for medical care that laymen would readily discern as requiring prompt medical attention by competent health care providers. *Napier* applies where the plaintiff's "deliberate indifference" claim is based on the prison's failure to treat a condition adequately, or where the prisoner's affliction is seemingly minor or non-obvious. In such circumstances, medical proof is necessary to assess whether the delay caused a serious medical injury.

*Id.* at 898 (citing *Napier*, 238 F.3d at 742).

Here, plaintiff has failed to present any evidence showing that the ten month delay in diagnosing the torn rotator cuff exacerbated his condition. Therefore, plaintiff's complaints do not rise to the level of a constitutional violation as he fails to present evidence demonstrating the seriousness of the deprivation by showing that it adversely affected his condition.

Second, plaintiff argues that the "four month" delay in removing his sutures after his first surgery constitutes deliberate indifference to his medical condition. Although plaintiff initially complained that the sutures remained intact for a period of "four months" (Doc. 45 at 2), he later argued that the sutures were not removed for "two months." (Doc. 45 at 4). In reality, plaintiff's sutures remained intact for one and one-half months, from his initial surgery on October 29, 2003 (Doc. 24, Exh. C) to their removal on December 11, 2003. (Doc. 45, Exh. A-1).

Plaintiff alleges the delay in removing his stitches caused "severe pain and permanent disfigurement and unnecessary scarring." (Doc. 45 at 4). However, plaintiff presents no evidence showing that the delay caused any adverse effects such as "permanent disfigurement and unnecessary scarring." On November 18, 2003, three weeks after his surgery, the prison doctor noted that the "suture line looks fine" and determined that plaintiff's "sutures do not need to be removed today." (Doc. 24, Exh. A-5). On December 9, 2003, the doctor noted "[t]he stitches are still in place." (Doc. 24, Exh. A-6). While the doctor noted plaintiff's request "to have his Ultram renewed," there is no indication plaintiff requested removal of the sutures. Two days later, his stitches were removed. (Doc. 45, Exh. A-1). The consultation request dated December 11, 2003 notes no complications from the removal of the sutures or complaints by plaintiff. (Doc. 45, Exh. A-1). Even if the removal of the stitches was uncomfortable or painful, this alone does not rise to the level of a serious medical condition warranting relief under the Eighth Amendment. *See Holman v. Fairman*, 1989 WL 65018 (N.D. Ill. 1989). *Cf. Myles v. Miller*, 2008 WL 2024978, *4 (M.D. Ga. 2008); *Wheeler v. Foti*, 1986 WL 447, *5 (E.D. La. 1986).

In any event, plaintiff has failed to present any evidence that defendant Lawson or any other prison official was notified of any particular problem with or need for removal of plaintiff's

13

stitches.  Contrary to his assertion, plaintiff's informal complaints to defendant Lawson which

are attached to his complaint do not reference any issue concerning a delay in removing his

sutures. (Doc. 2, attachments).  Plaintiff has failed to present any evidence showing defendant

Lawson or any other prison official knew about any alleged delay in removing his stitches and

was deliberately indifferent to this condition.

Third, plaintiff argues that the interference with his prescription medication based on

false misuse accusations of "cheeking" his medication constitutes deliberate indifference.[1]

Plaintiff denies that he misused his medication and states that if he did, he would have been

charged with a rule violation.  Plaintiff alleges he "was refused prescribed pain medication from

April, 2005 until August, 2005 (Doc. 45, Exhs. B-2, B-3), whereupon the medication was re-

issued but 'crushed,' which could have occurred throughout if the 'cheeking' pretext had been

factual." (Doc. 45 at 6).

Plaintiff's progress notes show that although the Ultram was discontinued for this period,

plaintiff received both Motrin and Naprosyn for pain. (Doc. 24, Exh. A-11, A-12).  In addition,

plaintiff has failed to present any evidence that defendant Lawson played any role in the

discontinuation of his medication.  Defendant Lawson cannot be found deliberately indifferent to

a substantial risk of serious harm for merely failing to intervene in a decision made by another

prison official.  *See Shehee v. Luttrell,* 199 F.3d 295 (6th Cir.1999) (holding that a prisoner did

not have a § 1983 claim against prison officials who had not "directly participated, encouraged,

---

[1] To the extent plaintiff now attempts to raise an entirely new claim that the withholding of his medication was in retaliation for his utilizing the grievance procedure (Doc. 45 at 6), plaintiff has failed to allege this claim in his complaint and may not do so at this juncture.

14

authorized, or acquiesced" in the allegedly unlawful conduct.)

In any event, the evidence submitted by plaintiff shows that the LeCI doctor ordered that the Ultram be discontinued on April 14, 2005 because of "cheeking." (Doc. 45, Exh. B-1). Plaintiff has presented no evidence showing that the decision to stop his medication was for any other reason. In a prison setting, the decision to discontinue a pain medication because of concerns of abuse of such medication does not amount to deliberate indifference to serious medical needs. *See Johnson v. Herman*, 2006 WL 1408389, *3 (N.D. Ind. 2006) ("An inmate who will not take his medication when it is dispensed does not appear to need the medication. This is particularly true for pain medication. Even if he is in pain as a result, he appears willing to suffer that pain in exchange for whatever benefit he receives by not immediately taking the medication."); *Shea v. Wheeler*, 2001 WL 34376846, *6 (W.D. Wis. 2001) (holding that prison doctor's decision to discontinue inmate's prescription for misuse, even after inmate was found not guilty at a subsequent disciplinary hearing, did not constitute deliberate indifference); *Jones v. Ehlert*, 704 F. Supp. 885, 888-90 (E.D. Wis. 1989) (no deliberate indifference found where prisoner's Valium was discontinued after sergeant at correctional institution accused prisoner of palming off medication). In the absence of any evidence showing that plaintiff's medication was discontinued for a reason other than suspected abuse, plaintiff has failed to raise an issue of fact requiring resolution by a jury.

Fourth, plaintiff argues that defendant failed to "properly administer the prescribed physical therapy following the first surgery, and the second surgery and was the direct and/or proximate result of the permanent physical injury and disfigurement Plaintiff continues to

15

suffer." (Doc. 45 at 7). Plaintiff contends he made "repeated requests" that the prescribed therapy be followed, but was refused. (Doc. 45 at 9).

A review of the evidence shows that plaintiff made only one informal complaint to defendant Lawson concerning the administration of his physical therapy. On December 22, 2003, plaintiff complained that the LeCI medical staff refused to administer the therapy "as the doctor ordered" and that the alternatives implemented by the staff hurt his shoulder. (Doc. 24, Exh. H). He also complained that the staff refused his request to use the "therapy machine." *Id*. In her response, defendant Lawson stated:

> Per the OSU recommendations you are to use a red theraband every day. The treatment book reflects you have been coming for this and you also have a follow-up scheduled with physical therapy. LeCI does not have a therapy machine and there is no recommendation for this as well.

(Doc. 24, Exh. H). Two days later, plaintiff was seen by the CMC physical therapist. (Doc. 45, Exh. D-7). The physical therapist's notes state, "Pt. reports ex as instructed with pain continuing." *Id*. He was given a red theraband with instructions and the note states, "Please allow pt. to use theraband daily." *Id*. A physical therapy note dated January 16, 2004 states, "Pt. reports cont. pt. c/o [complaints] that he's not able to ex with red theraband as he would like to. Called LeCI infirmary re: red band–institution program." (Doc. 45, Exh. D-9).

There are no other notes or informal complaints indicating plaintiff experienced any further problems with theraband physical therapy after the January 16, 2004 note. Nor is there any evidence showing that the alleged failure to follow the physical therapy instructions for this short period of time resulted in any harm to or deterioration of plaintiff's shoulder. In fact, the evidence shows that by February 20, 2004, plaintiff's condition had improved to the point where

16

his work and recreation restrictions were lifted. (Doc. 24, Exh. A-7). Plaintiff may not rely on his own conclusory statements of harm, but must present evidence creating a genuine issue of fact.

Plaintiff also filed an informal complaint with defendant Lawson on January 24, 2004 about a nurse's refusal to give him an ice pack after his physical therapy session that date. (Doc. 24, Exh. K). In response, defendant Lawson advised plaintiff that she instructed all the nurses whom he would see in the infirmary to give plaintiff an ice pack following his physical therapy sessions. *Id.* There is no other evidence showing plaintiff was ever denied an ice pack after January 24, 2004.

The evidence shows that defendant Lawson was not deliberately indifferent to plaintiff's complaints concerning his physical therapy, but rather took prompt and appropriate action to remedy the issues raised. Plaintiff has presented no other evidence showing he was denied appropriate physical therapy or that medical staff interfered with his prescribed therapy.

The record as a whole shows plaintiff received regular medical care for his shoulder condition. While plaintiff disputes some of the care he received, he has failed to come forward with evidence showing that such care was objectively seriously harmful to him or that the defendant or any other prison official was deliberately indifferent to his medical needs. "Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims that sound in state tort law." *Westlake v. Lucas,* 537 F.2d 857, 860, n. 5 (6th Cir. 1976). Since the evidence in this case could not lead a rational trier of fact to find for

17

plaintiff, there is no genuine issue for trial. *Matsushita*, 475 U.S. at 587. Accordingly, defendant's motion for summary judgment should be granted.

## II. Plaintiff's motion to amend the complaint should be denied.

The granting or denial of a motion to amend pursuant to Fed. R. Civ. P. 15(a) is within the discretion of the trial court. Leave to amend a complaint should be liberally granted. *Foman v. Davis*, 371 U.S. 178 (1962). The Court should consider factors such as undue delay, bad faith or dilatory motive on the part of the movant, the repeated failure to cure deficiencies by amendments previously allowed, lack of notice to the opposing party, undue prejudice to the opposing party by virtue of allowance of the amendment, and futility of amendment. *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Brooks v. Celeste*, 39 F.3d 125, 130 (6th Cir. 1994). The Court may deny the motion to amend where the complaint, as amended, could not withstand a motion to dismiss. *Rose v. Hartford Underwriters Ins. Co.,* 203 F.3d 417, 420 (6th Cir. 2000); *Matthews v. Jones,* 35 F.3d 1046, 1050 (6th Cir. 1994); *Thiokol Corp. v. Dept. of Treasury*, 987 F.2d 376, 383 (6th Cir. 1993). Leave to amend the complaint to add a new party should be denied where substantial prejudice would result to the opposing parties. *See Foman v. Davis*, 371 U.S. 178, 182 (1969); *Janikowski v. Bendix Corp.*, 823 F.2d 945, 951-52 (6th Cir. 1987).

Plaintiff seeks leave to amend the complaint to name additional defendants and clarify the causes of action in this case. (Doc. 44 at 1). However, he has not attached a proposed amended complaint to his motion, nor has he identified the additional defendants or causes of action he wishes to bring. Plaintiff complains that "he is still in the process of attempting to identify some

of the necessary defendants" whose names appear in "the medical records that it took the defendant two years to produce." (Doc. 50 at 3).

Plaintiff has not shown good cause for his failure to present a proposed amended complaint to the Court. On June 6, 2007, the Court construed plaintiff's objections to the undersigned's previous Report and Recommendation as a request for additional discovery time, and granted plaintiff a continuance of ninety days to conduct discovery. (Doc. 31). Thereafter, plaintiff was given two extensions of time to respond to defendant's motion for summary judgment based on the discovery presented. *See* Docs. 41, 43. Plaintiff admits he has been given discovery documents by defendant, but, to date, he has still not presented a proposed complaint. Plaintiff has had ample time to submit a proposed amended complaint to the Court. Since he has failed to do so, the Court cannot discern what additional parties or claims he may be seeking to bring, and whether those claims would relate back to the date of the original complaint under Fed. R. Civ. P. 15(c) and not be barred by the applicable two year statute of limitations for Section 1983 actions. For this reason, the motion to amend should be denied.

Additionally, the motion to amend should be denied because defendant and any newly named defendants would be unfairly prejudiced if an amendment were permitted at this late date. This case has been pending for over three years and the statute of limitations has passed. The discovery and dispositive motion deadlines have passed and plaintiff has not sought to extend either. Any new claims brought against defendant Lawson would require her to expend additional resources and time to defend such claims. Moreover, for the reasons discussed above in conjunction with defendant's motion for summary judgment, it appears any proposed amendment would be futile. Plaintiff's memorandum in support of the motion to amend suggests

19

that additional claims of deliberate indifference to medical needs similar to those in the original complaint would be brought against other medical personnel.  However, as explained above, the evidence fails to show that medical personnel were deliberately indifferent to plaintiff's medical condition.  Since any proposed amended complaint would most likely be futile and be barred by the statute of limitations, the motion for leave to file an amended complaint should be denied. *See Jet, Inc. v. Sewage Aeration Sys.,* 165 F.3d 419, 425 (6th Cir. 1999).


## IT IS THEREFORE RECOMMENDED THAT:

1.  Defendant's motion for summary judgment and motion to renew and supplement her motion for summary judgment (Docs. 24, 39) be **GRANTED**.

2.  Plaintiff's motion to amend the complaint (Doc. 44) be **DENIED**.

2.  The Court certify pursuant to 28 U.S.C. § 1915(a)(3) that for the foregoing reasons an appeal of the Court's Order would not be taken in good faith.  *See McGore v. Wrigglesworth*, 114 F.3d 601 (6th Cir. 1997).


Date: 9/10/08

Timothy S. Hogan
United States Magistrate Judge

**NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO THIS R&R**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report & Recommendation ("R&R") within **TEN (10) DAYS** after being served with a copy thereof. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **TEN DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Peter Atakpu 392-309
Lebanon Corr. Inst.
PO Box 56
Lebanon, OH 45036

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X ☐ Agent
☐ Addressee

B. Received by ( Printed Name) | C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type
☑ Certified Mail ☐ Express Mail
☐ Registered ☐ Return Receipt for Merchandise
☐ Insured Mail ☐ C.O.D.

4. Restricted Delivery? (Extra Fee) ☐ Yes

2. Article Number
(Transfer from service label)

7001 2510 0008 6348 5864

PS Form 3811, August 2001     Domestic Return Receipt     102595-02-M-1540

1:05cv524    Doc. 51